UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEDRIC EARL HAMILTON, JR.,

  Petitioner,

v.            Case No. 20-C-1001

WARDEN GARY BOUGHTON,

  Respondent.

---

**DECISION AND ORDER DENYING PETITION
FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

---

On July 2, 2020, Petitioner Dedric Earl Hamilton, Jr., filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Hamilton was convicted in Milwaukee County Circuit Court of first-degree sexual assault of a child under thirteen years old and incest with a child, and was sentenced to a total of 21 years of initial confinement and six years of extended supervision. Hamilton asserts that trial counsel was ineffective in failing to challenge the voluntariness of his *Miranda* waiver and subsequent statements and in failing to present evidence calling the reliability of the statements into question at his trial. For the reasons that follow, the petition will be denied and the case will be dismissed.

## BACKGROUND

A Milwaukee County Circuit Court jury convicted Hamilton of first-degree sexual assault of a child and incest with a child. The jury found that Hamilton sexually assaulted his eight-year-old niece, D.H., while she slept at her grandmother's house on the night of June 25, 2012. D.H. went home the next day and told her mother that, as she was sleeping in the living room at her grandmother's, Hamilton woke her up. She started crying and told her mother that Hamilton had

asked her, "I'm your favorite uncle, ain't I?" D.H. said she nodded yes, and Hamilton then pulled her pants down. D.H. became upset, and her mother asked her to stop telling the story until a friend of D.H.'s mother could come listen. D.H.'s mother said that she wanted the friend to hear what D.H. said because she "knew that somebody close needed to hear everything. And at that time—moment—I wasn't able to hear everything."

D.H.'s mother also called the police, and a sensitive crimes officer responded around 9:00 p.m. The officer testified that when she asked D.H. if she knew why the officer was there, D.H. responded that it was because Hamilton "had put his you know what between her legs." D.H. was admitted to the emergency room just after midnight for an examination by a sexual assault nurse examiner. She told the nurse that "Hamilton had come into the room where she was sleeping, given her a hug, pulled her back to him, put 'his thing' between her legs, and pulled down her panties and started 'digging around' in her genitals with his fingers." D.H. also told the nurse that "Hamilton repeatedly told her to 'be a good girl' and kissed her and was 'grabbing [her] butt.'"

The nurse's exam showed that D.H.'s "internal vaginal tissue of the labia minora, not the surface area of the vaginal area, was abnormally 'red and tender throughout' and that there was an abrasion." There was "no evidence of poor hygiene or infection," which could have been alternate reasons for the redness. And the nurse said that the abrasion was consistent with how D.H. had described the assault because "[t]he digging around and fingers, abrasions are consistent with fingernail injuries."

The jury saw a recording of D.H.'s forensic interview. In it, she said that she had been "sleeping on the living room floor and Hamilton had awakened her, told her to give him a hug, then pulled her close to him and put his penis between her legs, pulled down her leggings and underwear, and started digging his fingers into her genitals, and she said this 'hurt bad.'" D.H. also

2

said that Hamilton had picked her up, kissed her, and began carrying her to his bedroom, but "she pushed him away and went back to the living room."

D.H. also testified at trial. She said that on the night of the assault, "she had been at her grandmother's house, sleeping on the floor with her younger brother, and that the other members of the household, including Hamilton, had been sleeping in the bedrooms." D.H. testified that Hamilton woke her up and she gave him a hug. Hamilton would not let her lie back down. She said that Hamilton pulled her pants down, and "he put 'his hand down there and start touching it.'" DH also said that Hamilton touched "her 'private part' with 'his private part.'" She said that "she told Hamilton to stop," but "he told [her] to be quiet." D.H. also testified that Hamilton had never seen her private parts. When asked to explain what this meant given her testimony, she said, "[h]e's never seen it, but he touched it."

The jury also saw an audiovisual recording of parts of Hamilton's custodial statement, which he made to Detective Steve Wells on June 27, 2012. The jury saw Hamilton's *Miranda* waiver and the parties stipulated that Wells had properly read Hamilton his rights and that Hamilton had waived them. Before reading Hamilton his rights, Wells confirmed with Hamilton that he had had his rights read to him before and that he had understood them. Wells then read Hamilton the *Miranda* warnings, and Hamilton said he understood them and that he was willing to talk to Wells, waiving his *Miranda* rights. Wells testified that during the interrogation "he told Hamilton that DNA tests proved that Hamilton touched [D.H.'s] vagina with his penis and hand." At trial, Wells admitted that no such DNA test results existed. During the interrogation, Hamilton denied D.H.'s allegations repeatedly, despite Wells' repeated reference to the nonexistent DNA results. Hamilton said that "all he had done was 'hug [D.H.] and pat her on the butt.'" He "then said he had both patted her on the butt and 'tapped her on her little stuff,' which he explained was

3

her vaginal area, adding that '[i]t was all in one motion though.'" Hamilton "expressed regret" and said that he "went stupid" when he did this. He said that he touched D.H. "between noon and 1:00 p.m. when he passed [D.H.] on the stairs, and he said that both his mother and brother were 'right there' at the time."

Hamilton did not testify or call any witnesses in his defense. In her closing argument, Hamilton's counsel emphasized that Hamilton had not confessed during the interrogation and admitted only that "he smacked [D.H.] on the butt." She argued that Hamilton had not admitted touching D.H.'s vagina, only "swooping one time across her butt" and that he denied that he did this for the purpose of sexual gratification. Counsel maintained that D.H. was fabricating the assault because she got upset when Hamilton hit her butt. She further argued that D.H. knew how to accuse Hamilton because of the fact that D.H. and her mother testified that D.H.'s older sister had accused a different uncle of sexual assault.

The jury convicted Hamilton of first-degree sexual assault of a child and incest with a child. The circuit court imposed consecutive sentences totaling 21 years of initial confinement and six years of extended supervision. After his conviction, Hamilton filed a postconviction motion in the circuit court seeking a new trial, arguing that his trial counsel had been ineffective in three ways related to his custodial statement. First, Hamilton claimed that his counsel should have moved to suppress the statement on the ground that his waiver of his *Miranda* rights was unknowing and unintelligent because Wells read the rights too fast and Hamilton's psychological and cognitive "risk factors" made him unable to understand them. Second, Hamilton argued that counsel should have moved to suppress the statement on the ground that his risk factors combined with Wells' interviewing techniques made the statement involuntary. Third, Hamilton asserted that counsel

4

should have presented expert testimony at trial that Hamilton's risk factors and Wells' interviewing techniques contributed to the possibility that he falsely confessed.

The circuit court denied Hamilton's motion without holding an evidentiary hearing. It concluded that Hamilton had failed to specifically assert what he did not understand about the *Miranda* warnings. The court also determined that Hamilton's statement was not involuntary. Finally, the court held that Hamilton was not prejudiced by his counsel's failure to challenge the statement's admission or introduce expert testimony. Hamilton appealed his conviction and the circuit court's order denying his postconviction motion to the Wisconsin Court of Appeals. He again claimed that his trial counsel was ineffective. The court of appeals affirmed, concluding that Hamilton had not met the *Strickland* prejudice prong. The Wisconsin Supreme Court denied Hamilton's petition for review.

## ANALYSIS

This petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, a federal court may grant habeas relief only when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" decisions from the Supreme Court, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315 (2015).

A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite conclusion as the Supreme Court would have on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's decision is an unreasonable application of established precedent when that state court applies Supreme Court precedent in "an objectively

5

unreasonable manner." *Id*. An "unreasonable application" of federal law means objectively unreasonable—even clear error is insufficient. *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014). This is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Hamilton argues that his trial counsel provided ineffective assistance by failing to challenge the voluntariness of his *Miranda* waiver and his subsequent custodial statements and by failing to present an expert at trial to show that the statements were unreliable. A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail on a claim for ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that the deficient performance deprived the petitioner of a fair trial. *Id*. at 687. If a defendant fails to satisfy one prong of the analysis, the court does not need to address the other. *Id*. at 687. The Supreme Court in *Strickland* emphasized that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.

In addressing this standard and its relationship to AEDPA, the Supreme Court has cautioned that "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington*, 562 U.S. at 105. When

relief is sought under § 2254(d) on a claim of ineffective assistance of counsel, the question concerning counsel's performance is not whether counsel's actions were reasonable. Instead, the question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The Wisconsin Court of Appeals concluded that, even if trial counsel's representation was deficient as Hamilton claimed, Hamilton failed to show that he was prejudiced by any of the alleged errors. Hamilton asserts that the Wisconsin Court of Appeals' decision that no prejudice resulted from counsel's deficient performance was an unreasonable application of *Strickland* and was based on an unreasonable determination of the facts in light of the evidence. A defendant is prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. When the last reviewing state court "'explains its decision on the merits in a reasoned opinion,' this presents a 'straightforward inquiry' for the federal habeas court." *Lentz v. Kennedy*, 967 F.3d 675, 688 (7th Cir. 2020) (quoting *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1192 (2018)). The issue is not whether the federal habeas court "agree[s] with the state court decision or even whether the state court decision was correct," it is "whether the decision was unreasonably wrong under an objective standard." *Dassey v. Dittman*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc)).

In reaching its decision, the Wisconsin Court of Appeals applied *Strickland* and found that Hamilton could not show that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The court rejected Hamilton's assessment of the strength of the State's case. It explained:

> First, there was no delay in reporting the assault—D. told her mother within fifteen minutes of arriving at home after being at her grandmother's house. When the

assault was reported to her, the child's mother immediately contacted police, and immediately took the child for a sexual assault examination. Second, the testimony of the sexual assault nurse and the evidence of redness, tenderness, and abrasions she observed on the inner part of D.'s genitals constituted strong corroboration of D.'s accusation. The nurse testified that the abrasion was unusual, was consistent with fingernail injuries, and was not likely to have come from normal childhood play and activity. She testified that D. described having genital pain and that there was no evidence of any other source of pain and redness, such as infection or poor hygiene. Third, the portions of D.'s trial testimony in which she stated that she "forgot" what happened did not contradict her previous accounts, and ultimately she testified consistently with the account she had told each adult after the assault. In fact, Hamilton does not even argue that any inconsistencies existed. Fourth, the jury saw the child's videotaped forensic examination and the child's testimony, during which she was subject to extensive cross-examination, and thus had ample opportunity to weigh her credibility. In sum, we conclude that the State's evidence against Hamilton was strong.

Dkt. No. 6-5 at 11.

The court of appeals also disagreed with Hamilton's claim that the admission of his "confession" affected the trial's outcome. Hamilton argued that the admission of his statement without expert testimony led the jury to believe that the interrogation was a search for the truth rather than an attempt to get him to confess. *Id.* at 12. The court of appeals understood Hamilton "to be arguing that without expert testimony to undermine the jury's trust in police methods, the jury likely gave unwarranted weight to his statement admitting 'patting' D.'s butt and 'tapping' her vaginal area over her clothing." *Id.* In rejecting Hamilton's argument, the court observed that the jury was clearly presented with the police conduct during the interview and Hamilton's verbal and physical reactions, the jury saw portions of the videotaped statements, the detective was "vigorously cross-examined" about his techniques and admitted that he lied to Hamilton, and trial counsel emphasized that police had been coercive in obtaining Hamilton's statement. *Id.* at 13. The court of appeals concluded that additional expert testimony was not reasonably likely to have resulted in a different outcome. *Id.*

The court of appeals further rejected Hamilton's argument that "the confession was the most damning piece of evidence against him." *Id.* The court explained that the "most damning" evidence was not Hamilton's minimized description of innocent touching of a child but rather D.H.'s consistent testimony, her immediate report, and the corroboration by witnesses and physical evidence. It recognized that Hamilton's statement was not a confession because he did not admit to what D.H. had accused him of or any criminal behavior. The court concluded that, even if the failure to move to exclude the statement was deficient, its content was "too exculpatory" to have substantially prejudiced Hamilton. *Id.*

The state court's decision finding that Hamilton was not prejudiced was not an unreasonable application of *Strickland*, nor did it involve an unreasonable determination of fact in light of the evidence. Although Hamilton disagrees with the court's interpretation of the evidence, he has not shown that no "fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Wisconsin Court of Appeals' no-prejudice ruling is well within the bounds of § 2254(d) reasonableness. Because the state court's decision finding that Hamilton was not prejudiced was not an unreasonable application of *Strickland* and did it involve an unreasonable determination of fact in light of the evidence, there is no need to separately assess *Strickland*'s deficient performance prong. 466 U.S. at 697. In sum, federal habeas relief is unavailable for this claim.

Hamilton argues that he should be granted an evidentiary hearing to establish that his counsel provided ineffective assistance. The Wisconsin Court of Appeals determined that Hamilton was not entitled to an evidentiary hearing on his motion "because, even if trial counsel's representation was deficient as he has claimed, he has failed to show that there is a reasonable

9

probability—'a probability sufficient to undermine confidence in the outcome'—that 'the result of the proceeding would have been different' but for the alleged deficiencies of trial counsel." Dkt. No. 6-5 at 3 (quoting *Strickland*, 466 U.S. at 694). Hamilton maintains that he is not asserting a separate claim that the state courts denied him a hearing. Indeed, such a claim is a state law claim that is not cognizable on federal habeas review. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984). Instead, Hamilton asserts that an evidentiary hearing would allow this Court to resolve the factual allegations regarding deficient performance and prejudice in his postconviction motion that the state courts did not address. Federal habeas review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Only after the habeas court determines that a petitioner has "overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 187. Because the court of appeals did not err in finding that Hamilton was not prejudiced by his counsel's performance, an evidentiary hearing is not required and Hamilton's request for an evidentiary hearing is moot. For these reasons, Hamilton's petition must be denied.

## CONCLUSION

For the reasons above, Hamilton is not entitled to federal habeas relief on any of his claims. His petition for writ of habeas corpus is therefore **DENIED**, and the clerk is directed to enter judgment dismissing the case. A certificate of appealability will be issued on the claim of ineffective assistance of counsel. Although I conclude that Hamilton is not entitled to habeas relief on these issues, it is possible that reasonable jurists would believe that Hamilton has made a substantial showing of the denial of a constitutional right.

Hamilton is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of August, 2021.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge